## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### OXFORD DIVISION

CORTEZ DEONTAE BASS                                    PETITIONER

v.                                                     No. 3:20CV260-MPM-DAS

NATHAN "BURL" CAIN, COMMISSIONER, ET AL.              RESPONDENTS

### MEMORANDUM OPINION

This matter comes before the court on the petition of Cortez Deontae Bass for a writ of *habeas corpus* under 28 U.S.C. § 2254. The State has responded to the petition; Bass has replied, and the parties have submitted additional briefing. The matter is ripe for resolution. For the reasons set forth below, the instant petition for a writ of *habeas corpus* will be denied.

### *Habeas Corpus* Relief Under 28 U.S.C. § 2254

The writ of *habeas corpus*, a challenge to the legal authority under which a person may be detained, is ancient. Duker, The English Origins of the Writ of Habeas Corpus: A Peculiar Path to Fame, 53 N.Y.U.L.Rev. 983 (1978); Glass, Historical Aspects of Habeas Corpus, 9 St. John's L.Rev. 55 (1934). It is "perhaps the most important writ known to the constitutional law of England," *Secretary of State for Home Affairs v. O'Brien*, A.C. 603, 609 (1923), and it is equally significant in the United States. Article I, § 9, of the Constitution ensures that the right of the writ of *habeas corpus* shall not be suspended, except when, in the case of rebellion or invasion, public safety may require it. *Habeas Corpus*, 20 Fed. Prac. & Proc. Deskbook § 56. Its use by the federal courts was authorized in Section14 of the Judiciary Act of 1789. *Habeas corpus* principles developed over time in both English and American common law have since been codified:

The statutory provisions on *habeas corpus* appear as sections 2241 to 2255 of the

1948 Judicial Code. The recodification of that year set out important procedural limitations and additional procedural changes were added in 1966. The scope of the writ, insofar as the statutory language is concerned, remained essentially the same, however, until 1996, when Congress enacted the Antiterrorism and Effective Death Penalty Act, placing severe restrictions on the issuance of the writ for state prisoners and setting out special, new *habeas corpus* procedures for capital cases. The changes made by the 1996 legislation are the end product of decades of debate about *habeas corpus*.

*Id*. Under 28 U.S.C. § 2254, a federal court may issue the writ when a person is held in violation of the *federal* Constitution or laws, permitting a federal court to order the discharge of any person held by a *state* in violation of the supreme law of the land. *Frank v. Mangum*, 237 U.S. 309, 311, 35 S. Ct. 582, 588, 59 L. Ed. 969 (1915).

### Facts and Procedural Posture[1]

#### Conviction and Sentence

Cortez Bass is in the custody of the Mississippi Department of Corrections ("MDOC") after his conviction for murder and sentence of life without parole – with a firearm enhancement – and is currently housed at the Wilkinson County Correctional Facility in Woodville, Mississippi. In affirming Bass' conviction and sentence, the Mississippi Court of Appeals summarized the facts of this case, as well as the testimony recounting the events leading up to Bass' murder of Donterrius Jackson:

¶ 4. On the afternoon of March 10, 2014, Jackson and his friend, George Anderson, encountered Bass, [his friend Dedrick] Small, and Bass'[] cousin, Kendrick, at an intersection in Tunica. An argument erupted between the two groups. *Seven witnesses* testified that the altercation ended with Bass fatally shooting Jackson.

¶ 5. Prior to the shooting, witnesses testified that Jackson and Anderson were walking down Cotton Street when Bass drove by and tried to hit Jackson with his car. After missing Jackson, Bass drove away, and Jackson and Anderson entered a nearby house. Later that day, Jackson and Anderson exited the house and were

---

[1] The court has drawn the facts and procedural posture of this case from the State's Answer, as they are both well-documented and uncontested.

standing near the Cottonland Village Apartments at the intersection of Beatline Road and Cotton Street, when Bass, Small, and Kendrick approached from the other side of the street. Although the two groups remained on their respective sides of the street, Bass and Jackson began to argue with each other.

¶ 6. At Bass'[] trial, multiple witnesses testified that Bass and Jackson initially appeared to be headed toward a fistfight. According to one witness, however, Bass claimed just prior to the shooting that he was going to kill Jackson. Witness testimony varied as to whether or not Bass obtained the gun he used from Small. Witness testimony also varied as to whether Bass fired the gun once or twice. Multiple witnesses for the State testified, however, that they never saw Jackson pull out a weapon and that he was trying to run away when Bass shot him.

*Bass v. State*, 273 So. 3d 768, 772–73 (Miss. Ct. App. 2018) (emphasis added). Indeed, Jackson's autopsy confirmed that he was retreating, as "[t]he medical examiner who performed Jackson's autopsy testified that Jackson died from a gunshot wound to the back of his head." *Id.* at 773.

The Mississippi Court of Appeals also summarized the eyewitness testimony of the murder victim's younger brother, Kendarrius:

¶ 7. Jackson's younger brother, Kendarrius, testified that he witnessed Bass shoot his brother from the upstairs bedroom of his family's apartment. Kendarrius further testified that, after seeing the shooting, he retrieved a gun from a closet in the apartment and ran outside. Kendarrius stated that he no longer saw Bass in the area but that a crowd had gathered around his brother's body. As a result, Kendarrius testified that he shot the gun into the air a few times to disperse the crowd. Kendarrius identified State's Exhibit S-11, a Davis P-380 semiautomatic handgun, as the weapon he fired into the air.

*Id.* at 773.

Bass and his first cousin, Kendrick, also testified regarding the events leading up to Jackson's murder:

¶ 8. Contrary to the testimony of the State's witnesses, Bass and his cousin, Kendrick, testified that Anderson escalated the altercation between the groups by saying, "Let's pistol play." Both Bass and Kendrick testified that Jackson then pulled out a gun and pointed it at them. In response, Bass and Kendrick stated that Small pulled out a gun of his own, a nine-millimeter handgun, which Bass snatched from Small. Bass'[] and Kendrick's testimonies differed as to what

- 3 -

happened next.   Bass testified that he fired the gun once and that he, Kendrick, and Small immediately ran back to his home on Cotton Street.[2]   As he was running, Bass testified that he saw Jackson's brother, Kendarrius, arrive at the street corner and pick up Jackson's gun.   Kendrick testified, however, that before Bass fired his shot, Kendarrius ran out of an apartment with a gun and started shooting at them.   Despite this discrepancy, both Bass and Kendrick testified that Kendarrius followed them down the street toward Bass'[] house and shot in their direction.

*Id.* at 773 (footnote in original).

The Mississippi Court of Appeals continued:

¶ 9. The State's witnesses corroborated that Bass, Kendrick, and Small ran to Bass'[] home on Cotton Street after the shooting.   One witness testified, however, that as Bass ran by her he said, "I hope I killed that bitch."   Lieutenant Dennis Hopson testified that he arrived at Bass'[] home shortly after the shooting to take Bass into custody.   According to Lieutenant Hopson, when Bass exited his home, his hands were wet and sudsy as though he had just washed them.   Captain James Smith, who also responded to the dispatch about the shooting, testified that he performed a gunshot-residue test on Bass.   The forensic scientist who analyzed the test results stated that, although thoroughly washing one's hands can remove gunshot residue, the test performed on Bass showed Bass still had particles indicative of gunshot residue on both his hands.   The forensic scientist further stated that *no* gunshot residue was found on *Jackson's hands*.   Emergency responders did, however, discover a .32-caliber handgun in Jackson's pocket after the shooting.   The emergency responder who found the weapon testified that Jackson was wearing two pairs of pants and that the gun was tucked into the front right pocket of Jackson's inner pair of pants.

¶ 10. Captain Smith testified that he also collected evidence from the crime scene.   Captain Smith stated that he found four .380-caliber shells in the front yard of the home on Cotton Street where the shooting occurred.   He also found one nine-millimeter shell casing in the middle of the road.

¶ 11. After being taken into custody, Bass gave a recorded statement to law-enforcement officers.   Investigator James Clark testified that Bass voluntarily waived his *Miranda*[3] rights and spoke to both him and Captain Rico Harris.   The State called Investigator Clark as a rebuttal witness to testify about the differences

---

[2]  The Mississippi Court of Appeals noted that "[t]he shooting occurred in front of 1251 Cotton Street, and Bass lived at 1185 Cotton Street."   *Bass*, 273 at 773 n.2.   The court further noted that "[b]oth Bass and Kendrick testified it took them about ten seconds from the location of the shooting to reach Bass'[] residence."   *Id.*

[3]  *Miranda v. Arizona*, 384 U.S. 436 (1966).

between Bass'[] pretrial statement and his trial testimony.   Investigator Clark stated that, during their interview, Bass claimed Jackson pulled out a gun and shot at him twice.   Bass then told the officers that he pulled out his own gun, which he had brought with him, and shot back at Jackson once or twice.   Unlike during his trial testimony, Bass denied during the pretrial interview that Small gave him the gun.   In fact, Investigator Clark testified Bass said Small had nothing to do with the gun.   Bass instead told the officers that he had bought the gun from a man for $100 and that he kept the weapon under his mattress.

*Bass*, 273 So. 3d at 772–73 (footnote in original) (emphasis added).

On June 11, 2015, in Tunica County Circuit Court, a jury convicted Bass for the first-degree murder of Jackson.   Exhibit A[4]; *see also* Doc. 12-1 at 140–41 (State Court Record ("SCR"), Cause No. 2017-KA-01009-COA, Vol. 1 at 139–40; Doc. 12-8 at 38 (SCR, Vol. 8 at 783)).[5]

Prior to sentencing, Bass' trial counsel filed multiple post-trial motions, including a motion for sentencing under *Miller v. Alabama*, 567 U.S. 460 (2012), because Bass was a juvenile at the time of the murder.   Doc. 12-2 at 6–38 (SCR, Vol. 2 at 155–87).   Bass was 70 days shy of his eighteenth birthday when he killed Jackson.   Doc. 12-2 at 90 (SCR, Vol. 2 at 239).   Bass' counsel also filed motions seeking funds to hire clinical and forensic psychologist

---

[4] The exhibits referenced in this memorandum opinion may be found attached to the State's response to the instant petition.

[5] The court refers to Bass' state court appellate record from his direct appeal by the filed document number (Docs. 12-1–12-12) and page number – or by "SCR" with the corresponding volume and page number – or both.   During a stay of this case, Bass returned to state court and sought post-conviction collateral relief.   As such, the State filed as a separate docket entry a copy of Bass' state post-conviction records.   Docs. 37-38.   The court refers to the state court record from Bass' post-conviction proceeding as "SCR" with the appropriate cause number and corresponding page number.   Bass' state court appellate record from his direct appeal references "an extensive hearing" on Bass' pretrial bond.   Doc. 12-3 at 17 (SCR, Vol. 3 at 2).   While the state court appellate record contains a copy of Bass' motion for bond reduction and the trial court's order denying bond (Doc. 12-1 at 45–50) (SCR, Vol. 1 at 41–49)), the record does not contain a copy of the transcript from that pretrial hearing.   *See generally*, Docs. 12-1–12-12 (SCR).   The State states that it is unaware of any additional recorded proceedings on Bass' murder conviction and sentence of life without parole that have not yet been transcribed.

W. Criss Lott, Ph.D., and a mitigation investigator.   Doc. 12-2 at 13–38 (SCR, Vol. 2 at 162–87).

After considering Bass' motions, the trial court:   (1) granted Bass' request for funds to employ Dr. Lott as a psychology expert, "specifically to examine [Bass] and *provide evidence and insight* to the [c]ourt in the sentencing of [Bass], pursuant to *Miller v. Alabama*"; and (2) denied Bass' request for funds for a mitigation investigator.   Doc. 12-2 at 50–53 (SCR, Vol. 2 at 238–40) (emphasis added).

In May 2017, two years after trial, the court held a *Miller* hearing to determine Bass' parole eligibility on his life sentence.   Doc. 12-2 at 89–90 (SCR, Vol. 2 at 238–40; Doc. 12-8 at 45–117 (SCR, Vol. 8 at 790–862); Doc. 12-9 (SCR, Exhibits).   The trial court stated that it had "carefully reviewed" Bass' 27-page evaluation report from clinical and forensic psychologist Dr. Lott.   Doc. 12-2 at 89–90 (SCR, Vol. 2 at 238–40); Doc. 12-8 at 45–117 (SCR, Vol. 8 at 790–862); Doc. 12-9 (SCR, Exhibits).   The trial court noted that "[Dr. Lott] was called upon to—really by the [d]efense—to conduct an evaluation of Mr. Bass and address those factors that are enumerated in *Miller versus Alabama*[.]"   Doc. 12-8 at 46–47 (SCR, Vol. 8 at 791–92).   The trial court then received testimony from four witness called by the State, showing Bass' increasingly violent behavior, his lengthy youth court record, and the impact of Jackson's murder.   Doc. 12-8 at 48–87 (SCR, Vol. 8 at 793–832).

Jackson's mother testified about the "ongoing issues with [her] family" and Bass, and Bass' threats to her son leading up to his murder.   Doc. 12-8 at 72–78 (SCR, Vol. 8 at 817–23).   She testified that Bass' threats "started back in middle school with [her] sons on a basketball court, with [her] son and his friends winning a basketball game."   Doc. 12-8 at 73 (SCR, Vol. 8 at 818).   "That made Cortez [Bass] angry … and it started a[n] altercation" at the park.   Doc.

12-8 at 73 (SCR, Vol. 8 at 817–18). "[L]ater on that night, Cortez [Bass] and his cousins and friends, they all came back and started a[n] altercation, and they got into a fight." Doc. 12-8 at 73 (SCR, Vol. 8 at 818). Jackson's mother also testified regarding many instances of Bass' "cyberbullying on Facebook[,]" including his threats to her, Jackson, his children, and their mother. Doc. 12-8 at 74 (SCR, Vol. 8 at 819). Jackson's mother recounted one of Bass' posts:

> —and it was a lot of incidents before this particular one. That he was saying that—telling his little niggers—that's what he said—"My little niggers, I want y'all to kill [Jackson, aka] 'Fella' for me." At this time, he wasn't in school but [Jackson] was, and they'll laugh about it, and it'll get a lot of comments. They be like, "Okay. We got you, G." I guess that's supposed to be "GD" for Gangster Disciple or something he call his self (sic).

Doc. 12-8 at 74 (SCR, Vol. 8 at 819).

Jackson's mother also testified about Bass' threats aimed at her about the "sexual things about what he's gonna [sic] do to [her]." Doc. 12-8 at 75 (SCR, Vol. 8 at 820). "He would say, 'Fella and Bubba, I'll get y'all's bitch ass mother to suck my penis.'" Doc. 12-8 at 75 (SCR, Vol. 8 at 820). Jackson's mother testified about her reports to law enforcement— including: going to the police station, reporting to officers at a "Blue & White" lunch, emailing copies of Bass' threats, and submitting reports and statements. Doc. 12-8 at 75 (SCR, Vol. 8 at 820). Jackson's mother also recounted that "[she] had police officers to come over [to their home] because [Bass] made a statement on Facebook and said that he was gonna come meet my son outside, and he did." Doc. 12-8 at 76 (SCR, Vol. 8 at 821). She described that simple assault incident:

> I can't remember when—how far it was before [my son] was murdered, but that was the night that he told my son to meet him outside, and he came outside my— Cortez [Bass] came outside my front door. He followed my son. That night I called the police and made a report. He was—he was picked up and charged with simple assault.

***

- 7 -

—and I think he stayed in jail for like 11 days—

***

—and he was released.

Doc. 12-8 at 76 (SCR, Vol. 8 at 821).   Jackson's mother continued:

> It [sic] was so much on Facebook, but I can say 14 days before my son was
> murdered [Bass] put that on Facebook.   He said, "You're a dead man walking.
> You're gonna die tonight on Jesus Christ."   He put our apartment number on
> Facebook.   He let us know that he was watching us because he was right across
> the street, and this played on down for 14 days.   Five days to my son's death,
> March the 5th, he posted "Rest in peace, Fella."   He said, "I don't bother
> anybody, but MFs hate me.   So y'all go ahead and rest in peace."   I didn't see
> that until after my son's death.   So he knew that Cortez [Bass] was serious, that
> he was gonna kill him.   But before all of that, Cortez [Bass] told my son it was
> over.   Let's be friends.   I told my son it was setup.   Don't trust him.   He's not
> for real.   He's not your friend.

Doc. 12-8 at 76–77 (SCR, Vol. 8 at 821–22).   Bass then carried out his threat; he murdered

Donterrius Jackson by shooting him in the back of the head as he retreated.   Doc. 12-8 at 77

(SCR, Vol. 8 at 822).

After considering the evidence from the hearing and the arguments of the parties, the trial

court ruled that Bass was ineligible for parole on his life sentence for first-degree murder.

Exhibit B; Doc. 12-2 at 89–91 (SCR, Vol. 2 at 238–40); Doc. 12-8 at 114 (SCR, Vol. 8 at 859).

The trial court also sentenced Bass to a consecutive five-year sentence for the firearm

enhancement.   Exhibit B; Doc. 12-8 at 114 (SCR, Vol. 2 at 238–40; Vol. 8 at 859).

**Direct Appeal**

Bass, through counsel, appealed his conviction and sentence, raising six grounds for

relief:

I.      The verdict was against the weight of the evidence.

II.      The court erred in not ordering a mistrial in light of media coverage.

- 8 -

III.   The trial court erred in refusing to approve funds for expert assistance in the field of mitigation investigation.

IV.   Bass'[] sentence was imposed in violation of his constitutional right to have his sentence determined by a jury.

V.   The trial court erred in sentencing Bass to life—without parole, as Bass is not one of the "uncommon" and "rare" juvenile homicide offenders who may be sentenced to die in prison.

VI.   Bass'[] sentence must be vacated[,] and he must be resentenced to life with parole.

*See* Doc. 12-11 (SCR, Briefs).[6]

The Mississippi Court of Appeals affirmed Bass' conviction and sentence.   Exhibit C

(*Bass v. State*, 273 So. 3d 768 (Miss. Ct. App. 2018), *reh'g denied*, March 12, 2019 (Cause No.

2017-KA-01009-COA)).   Bass then filed a petition for writ of certiorari with the Mississippi

Supreme Court, raising the following three issues, through counsel:

I.   The Court of Appeals erred with regard to the LWOP analysis.

II.   The Court of Appeals erred by failing to consider that the federal and state constitutions categorically bar the practice of sentencing children to die in prison.

III.   The Court of Appeals erred in affirming the lower court's denial of funding for a mitigation expert.

*See* Doc. 12-12 (SCR, Certiorari Folder).   On June 20, 2019, the Mississippi Supreme Court

denied the petition; all participating justices voted to deny certiorari.   Exhibit D.

**Initial Federal *Habeas Corpus* Proceedings**

On September 17, 2020, through original *habeas corpus* counsel, Bass filed a federal

petition for a writ of *habeas corpus*, raising four grounds for relief:

---

   [6] These six issues include those submitted by Bass' appellate counsel – and by Bass in his *pro se* supplemental brief.   *See* Doc. 12-11 (SCR, Briefs).

**Ground One**:    The State courts ignored clearly established federal law by imposing and affirming a sentence of life without parole without first determining that Bass'[] crime reflected "irreparable corruption" rather than "transient immaturity" in violation of the Eighth Amendment of the United States Constitution.

**Ground Two**:    The State courts ignored Bass'[] clearly established constitutional rights by denying his request to be sentenced by a jury.

**Ground Three**:    The State courts ignored clearly established law by denying Bass'[] request for funds to retain a mitigation expert and thus violating his rights to Due Process and Equal Protection.

**Ground Four**:    The evidence at trial was insufficient for any rational trier of fact to have found beyond a reasonable doubt that Bass acted with deliberate design.

Doc. 1.

To prevent piecemeal litigation of Bass' claims, the court granted the State's motion to stay Bass' federal *habeas corpus* proceedings pending a ruling by the Supreme Court in *Jones v. Mississippi*, No. 18-1259, and its interpretation of *Miller* and *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016). Doc. 6, Doc. 7. Following the Supreme Court's decision, this court lifted the stay. Docs. 8, 9; *see also Jones v. Mississippi*, 141 S. Ct. 1307 (2021).

In July 2021, the State moved to dismiss Bass' federal petition, as a "mixed petition" consisting of both exhausted and unexhausted claims. Doc. 11. Bass did not *fairly present* Grounds Two and Four to the Mississippi Supreme Court on certiorari review; nor did he seek state post-conviction relief prior to seeking federal *habeas corpus* relief). The State requested, alternatively, that the court order Bass to amend his petition to withdraw his unexhausted claims. Doc. 11. Finally, the State noted that Bass' claim in Ground One regarding "permanent incorrigibility" was exhausted, but the Supreme Court's decision in *Jones* precluded *habeas*

*corpus* relief as to that claim.   Doc. 11 at 11-13 (citing *Jones*, 141 S. Ct. at 1313–23).   The State

thus asked that the court permit Bass to proceed on his mitigation funding claim in Ground

Three, his only exhausted claim at the time.   *See generally*, Doc. 11.

Bass' original *habeas corpus* counsel then moved to withdraw and requested an extension

of time for new counsel to respond to the Motion to Dismiss.   Doc. 13.   The court granted both

requests.   Doc. 14.   On September 8, 2021, second counsel filed a "Motion to Stay Petition

While Petitioner Pursues Unexhausted Claims or in the Alternative Motion to Amend Petition."

Doc. 16.

On December 1, 2021, the court again stayed this case and directed Bass "to promptly

pursue relief in state court within 90 days of th[e] order."   Doc. 19 at 8.   Bass then sought and

received three extensions of time from the court to seek state post-conviction review.   Docs. 20,

22, 23, 24, 25.

### State Post-Conviction Proceedings

Bass, through second *habeas corpus* counsel, filed his "Application for Leave to File

Motion for Post-Conviction Relief," with a "Motion for Post-Conviction Relief to Vacate, Set

Aside, or Correct Sentence" ("PCR motion") in the Mississippi Supreme Court.   SCR, Cause

No. 2022-M-00694, PCR Motion.   Bass raised the following claim, as restated by the court:

I.      Trial counsel's failure to investigate and present mitigation evidence
        during the *Miller* hearing violated Bass' right to the effective assistance of
        trial counsel guaranteed by the Sixth and Fourteenth Amendments and the
        Mississippi Constitution.

SCR, Cause No. 2022-M-00694, PCR Motion at 76–141.   Bass argued that "defense counsel's

representation of Cortez was grossly deficient" for:   (1) "failure to perform any mitigation

investigation," (2) "failure to present mitigating evidence," (3) "failure to provide records to [his]

appointed psychologist"; and (4) "failure to present testimony of the psychologist of Cortez

[sic]."   SCR, Cause No. 2022-M-00694, PCR Motion at 13.   Counsel also attached records and an affidavit from the proposed mitigation witness.   *See* Cause No. 2022-M-00694.

On August 18, 2022, the Mississippi Supreme Court denied Bass' PCR motion, noting, "[h]e asserts that he received ineffective assistance of counsel because defense counsel failed to investigate and present certain mitigating evidence relevant to the trial court's sentencing decision under *Miller*[.]"   Exhibit E; *see also* SCR, Cause No. 2022-M-00694.   However, "[a]fter due consideration, the panel f[ound] that Bass'[] application d[id] not make a substantial showing of the denial of a state or federal right."   Exhibit E (citing Miss. Code Ann. § 99-39-27(5) (Rev. 2020)); *see also* SCR, Cause No. 2022-M-00694.

### Amended Federal Petition for Writ of *Habeas Corpus*

Bass, through present counsel, filed his amended federal petition for a writ of *habeas corpus* on October 4, 2022, setting forth the following two grounds for relief, as restated by the court.

| | |
|---|---|
| **Ground One**: | Bass was denied his right to the effective assistance of trial counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and the Mississippi Constitution for failure to investigate and present mitigation evidence. |

(a) Counsel failed to perform any mitigation investigation.

(b) Counsel failed to present mitigating evidence.

(c) Counsel failed to object to the introduction of Bass' youth court records into evidence.

(d) Counsel failed to object to the introduction of impermissible victim impact evidence.

| | |
|---|---|
| **Ground Two**: | The trial court's denial of Bass' request for funds to hire a mitigation expert ignored clearly established federal law and violated his rights to due process and equal protection. |

- 12 -

Doc. 35; *see also* Docs. 35-1–35-8.   Bass requests that the court vacate his conviction and sentence of life without parole and hold an evidentiary hearing.   Doc. 35 at 14.

The State responded [37] to the petition, and the petitioner replied [41], raising new claims for the first time in his reply.   The State objected [42] to the new claims, and the petitioner responded [43] to the objection.

### The Court Will Not Consider Grounds
### Raised for the First Time in a Reply

In his Reply to the State's Answer, Bass argues, for the first time, that the Mississippi Supreme Court's denial of his state post-conviction motion (PCR) was defective and did not constitute a merits adjudication – and that his state post-conviction proceedings violated his right to due process.   Doc. 41 at 3–4.   However, "[a] party cannot bring up new matters in a reply brief to which its opponent has no opportunity to respond." BRIAN R. MEANS, FEDERAL HABEAS MANUAL, § 8:35 Habeas Rule 5 (2022 Edition) (citing *United States v. Cox*, 7 F.3d 1458, 1463 (9th Cir. 1993); *Herbert v. National Academy of Sciences*, 974 F.2d 192, 195 (D.C. Cir. 1992)). Indeed, a petitioner may not bring up matters for the first time in reply – except to cure a manifest injustice.   *Hopper v. Dretke*, 106 F. App'x 221, 228 n.25 (5th Cir. 2004).   Bass has not identified such a manifest injustice; as such, the new claims in his Reply are not properly before the court, and the court will not consider them.

### Grounds One(c) and One(d) are Procedurally Defaulted

Bass is not entitled to *habeas corpus* relief on his third and fourth allegations of ineffective assistance of trial counsel because the claims are both unexhausted in state court and procedurally defaulted.   In addition, Bass did not provide argument to support these claims in his amended petition.   First, Bass never raised these two issues during state post-conviction collateral review.   *See* SCR, Cause No. 2022-M-00694; *see also Wilder v. Cockrell*, 274 F.3d

- 13 -

255, 261 (5th Cir. 2004) (citing *Jones v. Jones*, 163 F.3d 285, 296–98 (5th Cir. 1998) (requiring exhaustion of each distinct claim of ineffective assistance)). Further, as Bass has filed both a direct appeal and an application for post-conviction relief, he has no available path to raise those arguments with the Mississippi Supreme Court. These two claims are procedurally defaulted and thus barred from federal *habeas corpus* review. *See Sones v. Hargett*, 61 F.3d 410 (5th Cir. 1995). Bass has shown neither cause and prejudice – nor a fundamental miscarriage of justice – to allow this court to review these claims on the merits. *See Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *Hughes v. Quarterman*, 530 F.3d 336, 343 (5th Cir. 2008) (in the absence of showing cause, the court need not consider whether actual prejudice occurred).

Second, Bass offers no argument in support of his third and fourth allegations of trial counsel ineffectiveness, Doc. 35, and conclusory allegations cannot support federal *habeas corpus* relief. *See Collier v. Cockrell*, 300 F.3d 577, 587 (5th Cir. 2002). Thus, the court will not consider Bass' claims in Grounds One(c) and One(d), as they are unbriefed, unexhausted, and procedurally defaulted.

### Grounds Reviewed on the Merits in State Court

The Mississippi Supreme Court has already considered Bass' remaining claims in Grounds One(a), One(b), and Two on the merits and decided those issues against him; hence, these claims are barred from *habeas corpus* review by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d), unless they meet one of its two exceptions:

> (d) An application for a writ of *habeas corpus* on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings *unless* the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

- 14 -

> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

*Id.* (emphasis added).   The first exception, subsection (d)(1), applies to questions of law.

*Morris v. Cain*, 186 F.3d 581 (5th Cir. 2000).   The second exception, subsection (d)(2), applies

to questions of fact.   *Lockhart v. Johnson*, 104 F.3d 54, 57 (5th Cir. 1997).   Since the

petitioner's claims challenge both the application of law and the finding of fact, this court must

consider the exceptions in both subsections.

Under subsection (d)(1), a petitioner's claim merits *habeas corpus* review if its prior

adjudication "resulted in a decision that was *contrary to*, or involved an *unreasonable*

*application* of, clearly established Federal law."   *Id.* (emphasis added).   A state court's decision

is *contrary to* federal law if it arrives at a conclusion opposite to that reached by the United

States Supreme Court on a question of law, or if it decides a case differently from the Supreme

Court on a set of "materially indistinguishable facts."   *Williams v. Taylor*, 529 U.S. 362, 120

S.Ct. 1495, 1523 (2000).   A state court's decision involves an *unreasonable application of*

federal law if it identifies the correct governing principle but unreasonably (not just incorrectly)

applies that principle to facts of the prisoner's case; this application of law to facts must be

*objectively* unreasonable.   *Id.* at 1521.   As discussed below, the petitioner has not shown that

the Mississippi Supreme Court unreasonably applied the law to the facts, or that the court's

decision contradicted federal law.   Accordingly, the exception in subsection (d)(1) does not

apply to Grounds One and Two of the petitioner's claim.

Nevertheless, under § 2254(d)(2) these grounds may still merit review if those facts to

which the supreme court applied the law were determined unreasonably in light of the evidence

presented.   Because the supreme court is presumed to have determined the facts reasonably, it is

- 15 -

the petitioner's burden to prove otherwise, and he must do so with clear and convincing evidence. *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000); 28 U.S.C. § 2254(e)(1). As discussed below, the petitioner has failed to meet this burden; as such, he cannot use subsection (d)(2) to move these claims beyond § 2254(d), which bars from *habeas corpus* review issues already decided on the merits.

### Grounds One(a) and One(b): Ineffective Assistance of Counsel for Failing to Investigate and Present Mitigating Evidence for Bass' *Miller* Hearing

As Grounds One(a) and One(b) are closely related, the court will discuss them together. The court must address claims of ineffective assistance of counsel under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prove that defense counsel was ineffective, the petitioner must show that counsel's performance was deficient and that the deficiency resulted in prejudice to his defense. Under the deficiency prong of the test, the petitioner must show that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The court must analyze counsel's actions based upon the circumstances at the time – and must not use the crystal clarity of hindsight. *Lavernia v. Lynaugh*, 845 F.2d 493, 498 (5th Cir. 1988). The petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted).

To prove prejudice, the petitioner must demonstrate that the result of the proceedings would have been different or that counsel's performance rendered the result of the proceedings fundamentally unfair or unreliable. *Vuong v. Scott*, 62 F.3d 673, 685 (5th Cir. 1995), *cert. denied*, 116 S.Ct. 557 (1995); *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *Sharp v. Johnson*, 107 F.3d 282, 286 n.9 (5th Cir. 1997). "When §2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied

*Strickland's* deferential standard." *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011); *Premo v. Moore*, 131 S.Ct. 733 (2011).

Bass argues that trial counsel was ineffective in his investigation and presentation of mitigation evidence for Bass' *Miller* hearing. Doc. 35 at 4–12. Bass argues that trial counsel's "representation … was grossly deficient" and violated "[Bass'] Sixth Amendment right to competent counsel" for: (1) "failure to perform any mitigation investigation," (2) "failure to present any mitigating evidence."[7] Doc. 35 at 5.

In his amended petition, Bass alleges that trial counsel failed to conduct an adequate mitigation investigation in preparation for the *Miller* hearing. Doc. 35 at 5. Bass argues that trial counsel "did not obtain Bass' youth court records, circuit court records on the family, or mental health treatment records" and that "[t]he only social history records provided to Dr. Lott were school records." Doc. 35 at 5. Bass further argues that most of his youth court incidents involved family conflict, so, "[c]learly, Cortez was raised in a horrific, crime producing setting that he could not extricate himself from." Doc. 35 at 6 (citing *Miller*, 567 U.S. at 470). Bass also alleges that trial counsel performed ineffectively in his presentation of evidence during Bass' *Miller* hearing, particularly in deciding not to present any live witnesses. Doc. 35 at 5.

Bass raised these arguments with the Mississippi Supreme Court on state post-conviction review. SCR, Cause No. 2022-M-00694. The Mississippi Supreme Court denied these claims, holding that "Bass'[] application d[id] not make a substantial showing of the denial of a state or federal right." Exhibit E (citing Miss. Code Ann. § 99-39-27(5) (Rev. 2020)); *see also* SCR, Cause No. 2022-M-00694.

---

[7] As discussed above, the court will not consider Grounds One(c) and One(d), as they are procedurally defaulted, and Bass did not brief these issues in the instant Amended *habeas corpus* petition.

**Standard for an Adequate Investigation for Criminal Defense**

The Supreme Court has set forth the nature and depth of the investigation counsel must undertake when defending a client against criminal charges. "Counsel has [] a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." *Strickland*, 466 U.S. at 688 (citing *Powell v. Alabama*, 287 U.S. 45, 68–69 (1932)). Counsel must "make reasonable investigations or … make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The "decision not to investigate must be directly assessed for reasonableness in all the circumstances," giving great deference to counsel's strategic decisions. *Id.* The defendant's statements or actions can "determine[] or substantially influence[]" whether counsel's actions are reasonable. *Id.* Further, "[c]ounsel's actions are usually based … on informed strategic choices made by the defendant and on information supplied by the defendant." *Id.* "In particular, [determining] what investigation decisions are reasonable depends critically on such information." *Id.* If the defendant's statements support a defense, counsel may curtail or forgo further investigation as to that issue. *Id.* Indeed, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.*

**Counsel's Mitigation Investigation and Presentation
of Arguments to the Trial Court Were Reasonable**

Several basic questions can resolve the ineffective assistance of counsel issue. First, has the petitioner shown that counsel provided constitutionally deficient performance? Specifically, under the deferential *Strickland* standard: Has Bass "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy?'" *Strickland*, 466 U.S. at 689 (citation omitted). As discussed at length below, Bass has not overcome that

presumption.   Though that finding could end the inquiry, *Hughes v. Quarterman*, 530 F.3d at 343, the court also finds that, given Bass' extensive juvenile record – and his harassing and threatening behavior leading up to the murder – Bass has shown no prejudice from counsel's actions.

As Bass has challenged counsel's investigation and presentation of evidence at the *Miller* hearing, the court will recount them in detail below.   First, the court notes that the type of information needed to analyze the *Miller* factors has a great deal of overlap with the type of information needed to support mitigation.   Indeed, both experts, if enlisted, would have been charged with assisting the court in analyzing the *Miller* factors, though each would have had a different focus.   Defense counsel clearly recognized this overlap, as he used Dr. Lott's lengthy report extensively during his mitigation argument.

Bass' counsel requested and received funds to hire psychologist Dr. Lott to assist the defense and provide evidence to the trial court for Bass' *Miller* hearing.   Doc. 12-9 at 28 (SCR, Exhibits).   Dr. Lott twice evaluated Bass (June 2, 2016, and November 8, 2016) – and issued a detailed 27-page report to the trial court on December 12, 2016.   *See* Doc. 12-2 at 89–91 (SCR, Vol. 2 at 238–40); Doc. 12-8 at 45–117 (SCR, Vol. 8 at 790–862); Doc. 12-9 (SCR, Exhibits). In its Answer, the State provided a detailed summary of Dr. Lott's report, as well as counsel's arguments before the trial court.   As the summary is both thorough and well-documented, the court will reproduce it below, with minor changes.

### Dr. Lott's Report

In his report, Dr. Lott identified the purpose of the evaluation:   "Cortez is a 20-year-old African American male who was referred by the Court, on motion of his attorney, for a forensic evaluation to evaluate 'each and every factor outlined in *Alabama v. Miller* and to report to this

court its findings in writing.'" Doc. 12-9 at 14 (SCR, Exhibits). Dr. Lott then listed the *twenty-four* sources of information that he reviewed for the evaluation, including the order to transport, indictment, Tunica County Sheriff's Department Records, supplemental report of the responding officer, Bass' NCIC report, statements of seventeen people (including Bass' family), Bass' school records, and a prior incident report. Doc. 12-9 at 14 (SCR, Exhibits). Collecting evidence from these many sources certainly qualifies as an investigation.

Dr. Lott crafted his report based on the following information, as provided by Bass, and corroborated by information from his mother, where possible: background information, educational history, employment history, legal history, medical/developmental history, medication information, daily/social activities, psychiatric history, drug/alcohol use history, and family psychiatric history. Doc. 12-9 at 14–24 (SCR, Exhibits). Bass' mother reported "that Cortez did not have any developmental delays, and" that "he ha[d] no major childhood illness or injuries" or medical problems. Doc. 12-9 at 22 (SCR, Exhibits). Bass reported "that he and his mother 'would get to arguing about [his] coming home too late,'" and "he has never had a relationship with his father." Doc. 12-9 at 23 (SCR, Exhibits). Dr. Lott also identified Bass' aunt, Patty Bass, as a "collateral source" who reported that "she had never seen [Bass] act in a violent or aggressive manner." Doc. 12-9 at 24 (SCR, Exhibits). She also confirmed that "[Bass] had very little interaction with his father or with an adult role model." Doc. 12-9 at 24 (SCR, Exhibits).

As to Bass' psychiatric history, Dr. Lott reported:

Cortez said he was never physically or sexually abused.

He said he was hospitalized at St. Francis in Memphis in 2010 "for anger problems. I would get mad quick for nothing." His mother had some difficulty recalling his treatment after his hospitalization (and I did not receive any mental health records).

He said he was referred to the mental health center after he was discharged from St. Francis but he refused to attend counseling because he did not want to be seen on "the mental health bus," and his mother corroborated this fact.

He said he began receiving medication while hospitalized at St. Francis, but he refused to take the medication after his discharge.

He said he has never received psychological testing.

Doc. 12-9 at 23–24 (SCR, Exhibits).

On Bass' "mental status evaluation," Dr. Lott noted that "[Bass] reported no history of manic or hypomanic behavior, but said he has a history of 'anger problems.'" Doc. 12-9 at 25 (SCR, Exhibits). "He said he would 'blank out and start fighting.'" Doc. 12-9 at 25 (SCR, Exhibits). Dr. Lott also reported:

When asked about any history of antisocial behaviors prior to the age of 18, he denied any history of having used a weapon in a fight, cruelty to animals, or setting fires. He said he had gotten into several fights, but he denied ever bullying anyone. He said he had destroyed property when he had gotten angry. He said he had kicked a car and broken a TV. He said he had never run away from home and had never skipped school. He denied any gang affiliation and he denied any history of inappropriate sexual behavior. His mother said she did not recall him kicking a car or breaking a television.

Doc. 12-9 at 25 (SCR, Exhibits).

Dr. Lott then discussed the *Miller* factors. Doc. 12-9 at 28–36 (SCR, Exhibits). Under *Miller*, prior to sentencing a juvenile homicide offender to life without parole, the sentencing authority must consider five factors: (1) the offender's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "the family and home environment that surrounds [the offender]—and from which he cannot usually extricate himself"; (3) "the circumstances of the homicide offense, including the extent of [the offender's] participation in the conduct and the way familial and peer pressures may have affected him"; (4) whether the offender "might have been charged and

- 21 -

convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors ... or his incapacity to assist his own attorneys"; and (5) "the possibility of rehabilitation." *Miller*, 567 U.S. at 480.

In his report, Dr. Lott assessed Bass on *Miller*'s five factors using all available relevant information from the numerous sources; generally discussed the applicable standards and other research; and applied each of the *Miller* factors to Bass. Doc. 12-9 at 28–36 (SCR, Exhibits). Dr. Lott laid out his conclusions on Bass and each *Miller* factor:

**1. Chronological Age and its Hallmark Features**:

Cortez was 17 years of age at the time of the offense.

Cortez's judgment and behavior at the time of the offense should be viewed in the context of an adolescent with undeveloped or immature cognitive skills that were subject to undue influences from a variety of factors, including, but not limited to, his age and subaverage intellectual abilities.

Cortez has a history of problems with impulsive behavior, and it appears that he reacted impulsively to the conflict between him and the victim at the time.

Cortez's behavior appears to have been directly influenced by his conflict history with the victim and the victim's peers.

I believe that Cortez suffered from the two "blind spots" and was clearly more reward sensitive and less risk averse due to his age and immaturity at the time of the offense.

Cortez has a history of problems with impulse control, which are due, in part, to his age and developmental immaturity and, due in part, to neurobiological deficits associated with an attentional disorder.

Doc. 12-9 at 30–31 (SCR, Exhibits). Dr. Lott concluded on the first factor:

Cortez's behavior at the time of the offense was influenced by a number of factors, including the nature and function of his brain development and his developmental immaturity, his subaverage intellectual abilities, as well as the lack of paternal involvement in his life, which will be described below.

Doc. 12-9 at 33 (SCR, Exhibits).

- 22 -

## 2. The Child's Home and Environment:

Cortez had almost no contact with his father (or any male role model) as a child or as an adolescent, and it appeared that he had little supervision throughout his adolescence.

Doc. 12-9 at 34 (SCR, Exhibits). Dr. Lott thus concluded on factor two that "most of the[] factors" identified by "several studies" as "plac[ing] children and juveniles at increased risk for delinquency" – "and gang affiliation" – "appear to have been present during Cortez's childhood and adolescence." Doc. 12-9 at 34 (SCR, Exhibits) (citing low family involvement, inappropriate parental discipline, low parental control or monitoring, poor affective relationships between parent and child, and parental conflict).

## 3. The Circumstances of the Homicide:

According to Cortez, his actions immediately preceding the time of the offense appear impulsive in nature and not necessarily premeditated. He and the victim had a long-standing conflict, and he said the victim began shooting at him before he began firing his gun.[8]

Doc. 12-9 at 34 (SCR, Exhibits).

## 4. Incompetencies Associated with Youth—Inability to Deal with Police Officers or Prosecutors, or Incapacity to Assist Counsel:

Cortez was 17 years old at the time of his arrest on the index offense. He reported the officer said he would never see his mother if he did not cooperate, and his mother said she did not give the officers permission to interrogate him.

Doc. 12-9 at 35 (SCR, Exhibits).

## 5. The Prospect for Rehabilitation:

Cortez has a history of impulse control and substance abuse as an adolescent. He was hospitalized as an adolescent and his mother indicated that he was referred to the mental health center for treatment, but he was not made to continue in the treatment.

---

[8] Though Bass reported that Jackson shot at him first, the evidence introduced at trial showed that he did not.

Cortez said he has had several RVR's in the jail.   He has not had any RVR's for violent offenses, and the Warden described Cortez as "childish."

Although I cannot opine with certainty, it is my opinion that Cortez does not appear to represent one of those "rare" and "uncommon" adult offenders who are incapable of being rehabilitated and thus are irredeemably incorrigible, but rather, he appears to have the potential for successful rehabilitation with the support of his family and friends in the community if he is given the appropriate opportunity and treatment.

Doc. 12-9 at 36 (SCR, Exhibits).

**The State's Proof at the *Miller* Hearing**

Almost six months later, at Bass' *Miller* hearing, the trial court received testimony from the State's four witnesses and noted that it had closely reviewed Dr. Lott's 27-page report before the hearing.   *See* Doc. 12-2 at 238–40; Doc. 12-8 at 790–862; *see also* Doc. 12-9 at 14–40 (SCR, Exhibits).   The State called its witnesses:   (1) Dr. Henry Hargrow, the Tunica County Youth Court designee who was familiar with Bass' youth court proceedings and records and through whom the State introduced that evidence (Docs. 12-8 at 48–71; 12-9 at 2–40 (SCR, Vol. 8 at 793–816; Exhibits)); (2) Linda Jackson, the victim's mother who testified about the "ongoing issues with [her] family" and Bass, Bass' threats to her son leading up to his murder, and the impact of her son's murder (Doc. 12-8 at 72–78 (SCR, Vol. 8 at 817–23)); (3) Maurice Williams, the assistant warden at the Tunica County Sheriff's Department who testified about Bass' behavior during his incarceration at the facility (Doc. 12-8 at 82–84 (SCR, Vol. 8 at 827–29)); and (4) Kendarrius Drummond, the victim's younger brother who gave a victim impact statement, only (Doc. 12-8 at 79–81 (SCR, Vol. 8 at 824–26)).

Although Bass did not present any witnesses during the hearing, trial counsel skillfully cross-examined Dr. Hargrow (Doc. 12-8 at 65–71 (SCR, Vol. 8 at 810–16)) and Williams (Doc. 12-8 at 84–85 (SCR, Vol. 8 at 829–30)) – and submitted Dr. Lott's report as evidence (Doc. 12-9

at 14–40 (SCR, Exhibits)).    As discussed below, trial counsel also presented mitigating evidence

from Dr. Lott's 27-page report in support of parole eligibility on Bass' life sentence.    Doc. 12-8

at 90–109 (SCR, Vol. 8 at 835–54)).

**Counsel's Proof and Argument**

At the outset of trial counsel's *Miller* argument, the court noted its main concern (Bass'

violent criminal past):

> The Court:    I figure your two … you've got some factors that weigh in your favor,
> and you've got some factors that don't.   Obviously, one of the factors that doesn't, he
> does have an extensive youth court record.   My count, there were 20 adjudications, 11
> of which were violent.   Of those that were violent, two involved the exhibition of a
> handgun; three involved either the exhibition or attempted use of a knife.   Obviously
> that weighs—does not weigh in favor—particularly favorable for the defendant.

Doc. 12-8 at 92–93 (SCR, Vol. 8 at 837–38).    Trial counsel responded, turning the trial court's

attention, instead, to the harsh circumstances of Bass' childhood and home environment:

> [Counsel]:    Judge, I think there is a separate and second way of looking at that.
> This young man's life from childhood until today has been an unmitigated disaster.
>
> The Court:    At least from age 11.
>
> [Counsel]:    At least from age 11, and we have to assume that something happened
> that was not positive between the ages of zero and 11 for him to begin making regular
> appearances before the youth court.   This is not naturally what children do coming out
> of the womb. They don't take on this life of crime at age 11.   Something went awry in
> this kid's formative years.   So, Judge, I think that it is—it is more evidence that he
> didn't have a chance from day one that we have this youth court record than if he had
> been the class valedictorian and the star football player, and then all of a sudden at age
> 17 had gone out and committed a murder.

Doc. 12-8 at 93 (SCR, Vol. 8 at 838); *see also* Doc. 12-8 at 790–862.

Trial counsel also stressed that – in Bass' voluminous youth court records – "so many of

the charges" against him "were, in fact, brought by members of the immediate family in the same

household."   Doc. 12-8 at 839.   The trial court acknowledged counsel's point, but stated that

Bass' youth court record was "a two-edged sword":

- 25 -

The Court:    Given that, though, … one of the other factors that you look at is incorrigibility, ability to be rehabilitated, things like that.   You know, the extensiveness of—it's kind of a two-edged sword a little bit—the extensiveness of the youth court record—and it does appear to have a progressively darker tone to it as he grew older.   I mean we started out—I say that.   We started out at age 11.   We started out with a simple assault and then a burglary, but then we get into simple assaults involving handguns and knives, and it goes through age 17, and then, of course, he was 17 when this happened.   So … like you asked Mr. Williams, yeah, there was a—there appears to have been a steady progression of criminal conduct, and each one, to some degree, more serious than the last.   I mean you could see—yeah, you could see it coming.

Doc. 12-8 at 94–95 (SCR, Vol. 8 at 839–40).   Trial counsel responded, again noting the harsh, chaotic circumstances of Bass' upbringing and home environment.   Doc. 12-8 at 841.

To frame that as a mitigating factor, counsel argued:

[Counsel]:     Okay. I understand the [c]ourt's thinking there or the [c]ourt's observation, Judge.   We are a product of our environments and what has been around us.   The [c]ourt sees the victim has a gallery of people here—

The Court:     I've noted no one is here on behalf of the defendant.

[Counsel]:     I would say, Judge, that for his entire life no one has really been there for the defendant.   Now, they may go visit in jail, and they may show up in youth court when compelled to come by subpoena, but does anybody actually believe that Mrs. Bass instilled this child with any of the necessary human qualities that so many of the rest of us got from the day we came out of the womb, and is it Mr. Bass'[] fault that that is the way that he was—raised is not even a good word—that is the way he was allowed to get older?

If the State of Mississippi can figure out a way to pass a law to punish the parents of Cortez Bass, I would say that they should be standing before the [c]ourt today as well because they bear responsibility.

Doc. 12-8 at 841.

The trial court then addressed Dr. Lott's report:

The Court:     I find that … in Dr. Lott's reports, certainly he goes through the various factors that *Miller* talks about.   Particularly, it starts … talking about the chronological age and its hallmark features … [and] it talks about the child's home environment.   It continues on through a great deal of the remainder of the report, and he talks a great deal about, particularly, generalities.   Now, he does—as I read it, … in the bolder and italicized portions of the report following each paragraph bring it back to Mr. Cortez and his assessment regarding Mr. Cortez. At least that's the way I read

the report …

[Counsel]:    And I agree with that assessment, your Honor.

The Court:    All right.

[Counsel]:    You know, so much of this—and I appreciate the background that Dr. Lott put in here about cognitive ability and impulse control because I really believe that's one of the strong parts of the *Miller* argument here.   We're talking about risk, reward, and deciding: "Is this worth it?"

The testimony, your Honor, is that this murder was about a basketball game, about losing, and we're not talking about losing an NBA game or losing a high school state championship.   We're talking about a backyard basketball game.   No adult of any reasonable maturity is going to have this week's-long feud and end up with a murder over a basketball game.   That just shows, Judge, how this kid did not have the ability to weigh the situation and, say:   All right. I'm not going to let this escalate to murder.

The Court:    What do you say in response to … when … Ms. Jackson [] testified [during that hearing] about the things that she was hearing, things on Facebook, leading up to the murder as it relates to impulse and self control?   Because that sounds more like something that was contemplated as opposed to something that was a snap decision, and I … view the impulse, self control aspect of something—you know, just impulsively did it, just a quick—didn't think about it, and it would seem that those factors—factors that lead up to the actual murder kind of cut against the impulsiveness of the action.

[Counsel]:    It's clear that it appears that Cortez was threatening and taunting the defendant in the days prior to his murder.   However, if the [c]ourt will remember the facts that came out during trial, it was that this was not a set up—it did not appear to be premeditated because a gun—

Doc. 12-8 at 99–101 (SCR, Vol. 8 at 844–46).   The trial court then discussed trial counsel's

description of the gun being "passed to Cortez" "at the very last second," a point of contention

during trial – a subject of conflicting testimony.   Doc. 12-8 at 101 (SCR, Vol. 8 at 846).

Trial counsel supported this point, arguing:

[Counsel]:    So I think that tends to shift back the thinking of he's hotheaded, and he's angry, and he's trying to scare somebody, including the sexually lewd comments that he made about Ms. Jackson.   I don't think anybody believes that—he intended to actually follow through with that, but it's being a loud mouth.   It's being a kid, not a good kid, but it's being an immature bully—may still be—but what I won't concede, your Honor, is that 47 years from now, after having spent that amount of time in the penal system and being an old man, that he is not—that he is irreparably incorrigible,

and … those are the exact words the Court uses for the test, and that's what this [c]ourt today really has to decide. Is this the rare juvenile offender whose crime reflects irreparable corruption and thus can never be rehabilitated? Dr. Lott says he doesn't think that is the case, but that is the—

The Court:        Well, he said he can't say with certainty.

[Counsel]:        Well, none of us can say with certainty—

***

None of us can, which is the reason we rely on experts like Dr. Lott who have a better chance, perhaps, of doing that through their education and training than—certainly I do, and I think that—I don't know about this court in particular, but many courts in which I practice in the state use Dr. Lott for that very purpose. If we have a sexual offender and we're seeking to do a sentencing, Dr. Lott will opine on whether he believes that this was an isolated incident or is this person likely to re-offend. I've probably done three or four of those with Dr. Lott in the last five years. I think that's what … the value of this report is, that you—neither you nor I or Mr. Williams can say what the probabilities are, but Dr. Lott can probably put a better chance on it than the rest of us without his training.

Doc. 12-8 at 102–03 (SCR, Vol. 8 at 847–48).

Counsel concluded that life without parole "should be reserved for absolutely the most depraved and incorrigible and irredeemable persons …, and I don't believe that that is Cortez Bass for the reasons that were in the report and the reasons that I have enumerated." Doc. 12-8 at 108 (SCR, Vol. 8 at 853). Trial counsel then addressed the State's point "that [Bass] was offered mental health and counseling, but that he refused," arguing as follows:

[Counsel]:        You know, the refusal of a child, again, goes—this is a circular argument in that if you allow a child to refuse or if a parent refuses such treatment as that on behalf of a child of a child, in neither circumstance[] should the child be held responsible for that. Of course a child is going to decline something that he or she doesn't want to do. That a part of poor decision making, and that's brought out in Dr. Lott's assessment as well.

The Court:        And I agree with that.

Doc. 12-8 at 108–09 (SCR, Vol. 8 at 853–54). Trial counsel concluded his *Miller* argument and asked that the trial court sentence Bass to life *with* the possibility of parole. Doc. 12-8 at 109

(SCR, Vol. 8 at 854).

**The Trial Court's *Miller* Ruling**

Before deciding Bass' parole eligibility, the trial court explained that it had considered

the witnesses' testimony and reviewed Dr. Lott's report.   Doc. 12-8 at 111 (SCR, Vol. 8 at 856).

The trial court then applied the *Miller* factors:

> It is significant, the extensive youth court record that the defendant did compile
> from ages of 11 to age of 17, leading into his actions … in March of 2014,
> wherein he did kill and murder this individual, this victim.
>
> The Defense counsel, I think, makes a point with regard to the upbringing or a
> lack thereof, a lack of—apparent lack of discipline as this defendant progressed
> through his youthful years into adolescence and then very early adulthood, and as
> indicated, that does to some extent weigh[], oddly enough—weigh in favor of
> eligibility for parole.   But, as I mentioned, it is a two-edged sword because …
> there's not a lot in his record that provides the [c]ourt any real substantial hope of
> rehabilitation.   Certainly the events occurring immediately prior to or in the few
> days leading up to this murder are not such that lead the [c]ourt to conclude that
> the actual murder was something out of—was an impulsive action on the part of
> the defendant.

Doc. 12-8 at 112 (SCR, Vol. 8 at 857).   The trial court added:

> It wasn't the first time this defendant had been in association with a deadly
> weapon.   Obviously … there are accounts in his youth court record that indicate
> the use of a handgun, something that he should not even have been in possession
> of, as well as a knife, and actual use of a knife.
>
>                     ***
>
> No significant psychiatric history was provided or found by Dr. Lott.   I want to
> say that the defendant denied use of drugs, alcohol, anything such as that.   You
> know, to be candid, in reading through the entirety of Dr. Lott's report, I can't say
> that I found anything that just stood out to me as being significantly negative in
> his—well the lack of involvement and contact with his father certainly is
> something that contributed, but I didn't see one particular incident or series of
> incidents that seem to lead Cortez Bass as a child, astray.
>
> The … question about rehabilitation is a different matter to assess.   I will say that
> given the extensive youth court record, particularly its progression toward more
> violent conduct, culminating in March of 2014 with the murder of the victim in
> this case, the [c]ourt probably has a darker view of the defendant than the Defense
> might choose for the [c]ourt to have.   It's hard to find any positive factors

- 29 -

> looking at what is known about the defendant and assessing what is the
> appropriate sentence.

Doc. 12-8 at 113–14 (SCR, Vol. 8 at 858–59).

The trial court ultimately sentenced Bass to life without parole for Jackson's murder, with

a consecutive five-year sentence for the firearm enhancement; the court issued a separate order

detailing its conclusions. Doc. 12-8 at 114 (SCR, Vol. 8 at 859); Doc. 12-2 (SCR, Vol. 2 at

238–40).

### The Mississippi Court of Appeals' Review of the *Miller* Ruling

The Mississippi Court of Appeals summarized the trial court's reasoning and final written

conclusions on the *Miller* factors. On the first *Miller* factor:

> As to chronological age, the circuit court noted that Bass was only about seventy
> days from his eighteenth birthday when he shot Jackson. The circuit court
> further noted that, prior to shooting Jackson, Bass had already compiled an
> extensive youth-court record between the ages of 11 and 17 and had previously
> used deadly weapons to commit crimes. In addition, the circuit court found that
> Bass'[] actions toward Jackson immediately prior to the shooting demonstrated a
> lack of impetuosity (a hallmark feature of the current *Miller* factor). Specifically,
> the circuit court stated that the threats Bass made to Jackson prior to the shooting
> displayed premeditation and/or an intention to kill Jackson. Based on these
> findings, the circuit court concluded Bass'[] chronological age weighed *against*
> granting parole eligibility under Miller.

*Bass*, 273 So. 3d at 781 (emphasis added).

> On the second *Miller* factor:

> As to Bass'[] family and home environment, the circuit court recognized that
> Bass'[] family and personal lives were regularly in a state of chaos, that Bass
> lacked a male role model, and that the lack of contact with his father affected
> Bass. The circuit court also found, however, that Bass had denied using drugs or
> alcohol and that Dr. Lott's report failed to provide a significant psychiatric history
> on Bass or to identify any particular incidents that significantly negatively
> impacted Bass'[] life. The circuit court determined Bass'[] family and home
> environment, especially the apparent lack of discipline in Bass'[] upbringing,
> weighed *partially in favor* of parole eligibility.

*Bass*, 273 So. 3d at 781 (emphasis added).

Regarding the third *Miller* factor:

> In considering the circumstances of Jackson's murder, the circuit court concluded this factor weighed *against* parole eligibility. Although testimony varied as to where Bass obtained the gun he used to shoot Jackson, witnesses repeatedly testified that Bass was the shooter and that he shot Jackson in the back of the head. The circuit court also discussed Bass'[] conduct toward Jackson immediately before the shooting, which included evidence that Bass tried to hit Jackson with his car and then verbally threatened to kill Jackson before shooting him. In addition, witnesses stated that Jackson was unarmed and was attempting to run away when Bass shot him. Based on the circumstances of the homicide, the circuit court found that Bass'[] actions displayed premeditation and/or an intention to kill Jackson.

*Bass*, 273 So. 3d at 781–82 (emphasis added); *see also* Doc. 12-5 at 57 (SCR, Vol. 5 at 355)

(testimony of a State witness recounting that Bass said that he was going to kill Jackson while they

were standing across the street from each other prior to the shooting); Doc. 12-5 at 109 (SCR, Vol.

5 at 407) (testimony of a State witness recounting that, as Bass ran past her after shooting Jackson

in the back of the head, Bass said, "I hope I killed that bitch").

On the fourth *Miller* factor:

> The circuit court did not directly discuss on the record whether Bass might have been charged and convicted of a lesser offense. However, the circuit court specifically provided that it conducted Bass'[] hearing and determined his sentence pursuant to *Miller*. Furthermore, in concluding its bench ruling, the circuit court stated that it was sentencing Bass to LWOP after considering **all the factors**, Dr. Lott's assessment, the witnesses' testimony, and the evidence presented. *See Jones* [*v. State*], —— So.3d at ——, 2017 WL 6387457, at *7 [(Miss. Ct. App. Dec. 14, 2017)] (recognizing that, while the circuit court did not specifically discuss each *Miller* factor on the record, "[n]either the United States Supreme Court nor the Mississippi Supreme Court has held that reversal is required just because the sentencing judge omits some factors from his on-the-record discussion of the reasons for the sentence").

*Bass*, 273 So. 3d at 782 (emphasis in original).

And as to the fifth *Miller* factor:

> Finally, with regard to the possibility of rehabilitation, the circuit court stated that Bass' youth-court record failed to provide "any positive factors" or "any

real substantial hope of rehabilitation."   The circuit court noted that Bass'
youth-court record detailed the commission of progressively more serious and
violent crimes, including those involving the exhibition and/or use of a deadly
weapon.   The circuit court further noted that this progression culminated with
Bass shooting Jackson in the back of the head.   The circuit court concluded the
evidence "paint[ed] a picture of an individual with little or no regard for the
value of human life or general decency among his fellow man" and "with little,
if any, possibility of rehabilitation."   The circuit court therefore found this
factor also weighed *against* parole eligibility.

*Bass*, 273 So. 3d at 782 (emphasis added).   The Mississippi Court of Appeals held that

"substantial evidence supported the circuit court's findings" on Bass' sentence of life without the

possibility of parole.

### Bass' *Habeas Corpus* Arguments in His Amended Petition

In his amended federal petition for a writ of *habeas corpus*, Bass challenges trial

counsel's mitigation investigation and alleges that trial counsel performed ineffectively in his

presentation of evidence during the *Miller* hearing.   Doc. 35 at 5.   Bass also challenges trial

counsel's decision to not present any live witnesses and, instead, rely on Dr. Lott's conclusions

in his report.   Doc. 35 at 5.   Bass also alleges that trial counsel "did not obtain Bass' youth

court records, circuit court records on the family, or mental health treatment records" and that

"[t]he only social history records provided to Dr. Lott were school records."   Doc. 35 at 5.

Finally, Bass argues that most of his youth court incidents involved family conflict, so,

"[c]learly, Cortez was raised in a horrific, crime producing setting that he could not extricate

himself from."   Doc. 35 at 6 (citing *Miller*, 567 U.S. at 470).

### Counsel's Arguments and Evidence Supporting the Possibility of Parole

Counsel adopted a strategy to highlight the evidence that favored parole eligibility – and

focused on the strongest – Dr. Lott's report.   *See, e.g.*, Doc. 12-8 at 93 (SCR, Vol. 8 at 838)

(arguing that "[Bass'] life from childhood until today has been an unmitigated disaster").   Trial

counsel stressed Bass' voluminous youth court records, noting that many of the charges against him were brought by family members of the same household.   Doc. 12-8 at 839.   Indeed, the trial court agreed that Bass' family and home environment, especially the "lack of discipline" during Bass' childhood and into very early adulthood … weighed partially in favor of parole eligibility."   Doc. 12-8 at 112 (SCR, Vol. 8 at 857).

Trial counsel also highlighted Dr. Lott's conclusions on Bass' cognitive ability and impulse control as "one of the strong parts of the *Miller* argument here," arguing that Bass was a "hotheaded" and "immature" kid, not a "permanently incorrigible" murderer.   Doc. 12-8 at 102–03 (SCR, Vol. 8 at 847–48).   Trial counsel stressed the prospect of rehabilitation, relying on Dr. Lott's conclusion in his report that Bass is not one of "the rare juvenile offender[s] whose crime reflects irreparable corruption and thus can never be rehabilitated[.]"   Doc. 12-8 at 102–03 (SCR, Vol. 8 at 847–48).

### Counsel's Decision Not to Seek Certain Records – or Present Live Testimony

Bass alleges that trial counsel was deficient for failing to obtain certain records, including Bass' youth court records, mental health treatment records, and the Bass family's criminal records – and that "a competent investigation would have revealed that Cortez' entire family was in trouble with law" (Doc. 35 at 5).   These allegations do not rise to the level of a constitutional violation.

#### Youth Court Records

First, as Bass, himself, acknowledges, from the outset, the trial court (which decided his sentence) was well aware of his extensive youth court records.   Doc. 35 at 5.   During a pretrial motions hearing, the trial court referenced a prior "extensive hearing" on Bass' pretrial bond, which the trial court ultimately denied.   Doc. 12-3 at 17 (SCR, Vol. 3 at 2); *see also* Doc. 12-1

at 49 (SCR, Vol. 1 at 48) (explaining in the order denying bond that the parties put on evidence on Bass' "circumstances," "family," and "prior history," and highlighting Bass' "long criminal history, dating back to age 11[,]" – and listing some of the crimes).

Though Dr. Lott does not list Bass' youth court records as information that he reviewed for the evaluation, his report notes that Bass and his mother relayed Bass' criminal history. Doc. 12-9 at 20 (SCR, Exhibits).   They told Dr. Lott that "Cortez … was seen in Youth Court several times, beginning at the age 11;" "he was placed in detention several times 'for getting in trouble at home and in the street'"; "[h]e was sent to the detention center at the age of 11 for two weeks"; "he was sent to Oakley Training School at the age of 15 and stayed three months"; and "he violated probation and was returned to Training School at the age of 16, and his mother corroborated these facts."   *Id.*   Dr. Lott was clearly aware that Bass had committed crimes as a juvenile.

**Family History Records**

The record also shows that part of trial counsel's strategy was to avoid focusing on Bass' extensive criminal history for the *Miller* hearing.   Indeed, Bass' ever more violent crimes, as the trial court observed, were a real obstacle to overcome:   "[G]iven [Bass'] extensive youth court record, particularly its progression toward more violent conduct, culminating in March of 2014 with the murder … [i]t's hard to find any positive factors looking at what is known about the defendant and assessing … the appropriate sentence."   Doc. 12-8 at 112–14 (SCR, Vol. 8 at 858–59).

Trial counsel's decision not to emphasize Bass' criminal history dovetailed with his hearing strategy of focusing on Bass' difficult childhood.   When Bass' criminal record came up, counsel argued that Bass' troubled family life led to his criminal charges – arguing that his

childhood circumstances were a mitigating factor. The strategy paid off to a degree, as the trial court agreed that Bass' violent and chaotic home environment (punctuated with violent episodes landing him in Youth Court) weighed partially in favor of parole eligibility. Doc. 12-8 at 112 (SCR, Vol. 8 at 857).

Second, Bass and his mother also reported to Dr. Lott that Bass never had a relationship with his father, and Bass' aunt corroborated that "[Bass] had very little interaction with his father or with an adult role model." Doc. 12-9 at 23–24 (SCR Exhibits). Bass argues that "the mitigation evidence regarding Cortez's chaotic childhood with a mother who went to jail for selling cocaine and no father is compelling evidence that the trial judge should have heard in deciding on a sentence." Doc. 35 at 11. However, at the hearing, evidence of Bass' childhood, his own criminal history, and lack of a father figure or any adult role model were all before the trial court. Doc. 12-9 at 23–24 (SCR Exhibits). Indeed, counsel stated, "[Bass'] life from childhood until today has been an unmitigated disaster" *and the court agreed*. Doc. 12-8 at 93 (SCR, Vol. 8 at 838). It appears unlikely that additional evidence of Bass' troubled home environment (including his family's criminal behavior) could have persuaded the trial court that Bass' home life was worse than an "unmitigated disaster." *Id.* Counsel's arguments convinced the trial court that Bass' difficult childhood and lack of discipline weighed partially in favor of parole eligibility. Doc. 12-8 at 112 (SCR, Vol. 8 at 857).

**Mental Health Records**

Bass also reported to Dr. Lott that "he was hospitalized at St. Francis in Memphis in 2010 'for anger problems'" and that "he was referred to the mental health center after he was discharged from St. Francis." Doc. 12-9 at 23–24 (SCR, Exhibits). However, once released, "he refused to attend counseling because he did not want to be seen on 'the mental health bus,'

and his mother corroborated this fact." *Id.*   Bass argues that "[t]he St. Francis treatment …

records show he made progress with the psychiatrist noting that Cortez 'responds to structured

environment'"   Doc. 35 at 6.   However, Bass and his mother reported that he refused the

counseling and medication prescribed to him.   *See* Doc. 12-9 at 23–24 (SCR, Exhibits).

Despite Bass' refusal to continue mental health treatment, Dr. Lott concluded that "[Bass]

appears to have the potential for successful rehabilitation with the support of his family and

friends in the community if he is given the appropriate opportunity and treatment."   Doc. 12-9 at

36 (SCR, Exhibits).   Thus, though the mental health records, themselves, were not before the

trial court, Dr. Lott's report contained information about Bass' mental health treatment obtained

from Bass and his mother.   Counsel presented that evidence to the trial court during Bass' *Miller*

hearing.   Doc. 12-9 (SCR, Exhibits).

**Live Witnesses**

As to the prospect of presenting live witnesses, such a decision is a strategic one.   Bass

argues that counsel could have called Bass' pastor, his aunt Patty, his mother, his brother, and his

sister as witnesses.   Doc. 41 at 8.   According to Bass, these witnesses could have testified

regarding his difficult childhood – or simply asked the court for mercy.   *Id*.   In addition, Bass

argues that counsel could have called a witness to introduce his mental health records.   *Id.* at 8-

9.   Such records would have shown that he suffered from a mood disorder – and that doctors

prescribed Risperdal, which calmed his mood.   *Id.*   Further, Bass argues that counsel could

have elicited testimony that Bass' mother had survived a serious ambulance accident, which left

her in a coma for over a month and caused her to undergo three surgeries.   *Id.* at 9.

Bass' claim regarding uncalled witnesses is without merit, as:

[c]omplaints of uncalled witnesses are not favored in federal *habeas corpus* review[.]
[A]llegations of what a witness would have testified are largely speculative.   Where

- 36 -

the only evidence of a missing witnesses' testimony is from the defendant, this Court views claims of ineffective assistance with great caution.

*Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986) (internal citations omitted); *Marler v. Blackburn,* 777 F.2d 1007, 1010 (5th Cir. 1985); *Sayre v. Anderson,* 238 F.3d 631, 635-636 (5th Cir. 2001). Further, courts are reluctant to grant *habeas corpus* relief based upon uncalled witnesses "because the presentation of testimonial evidence is a matter of trial strategy . . . ." *Buckelew v. United States*, 575 F.2d 515,521 (5th Cir. 1978).

While trial counsel could have called some or all of the witnesses and elicited the testimony suggested, Bass has ignored the potential pitfalls from doing so. First, any witness counsel called to testify would have been subject to cross-examination by the State. As trial counsel argued, many of Bass' guilty adjudications in Youth Court were involving assaults *on his immediate family members*. Doc. 12-8 at 839. As such, the State could well have elicited more detailed accounts of the assaults, as well as other crimes and misbehavior, undermining Bass' attempt to portray himself in a more sympathetic light. As to the diagnosis with and treatment for his mood disorder, Bass refused both medication and counseling, which also diminishes the impact of such testimony, as Bass knew of his condition, but refused to take steps to treat it. Doc. 12-9 at 23–24 (SCR, Exhibits). Finally, the trial court acknowledged Bass' terrible home life and the negative impact it had on him – finding that it weighed partially in favor of parole eligibility. As such, it does not appear that the additional information regarding his mother's automobile accident would have led to a more favorable ruling.

**The Decision Regarding the Evidence to Present Is Strategic**

Through cross-examination of the State's witnesses and introduction of Dr. Lott's report, counsel brought evidence to light regarding Bass' troubled and chaotic childhood. The court agreed with counsel that Bass' childhood was an "unmitigated disaster" – and weighed it

partially in favor of parole eligibility.  *Bass*, 273 So. 3d at 781.  It is unclear, at best, whether the additional evidence and testimony Bass believes should have been introduced would have resulted in a different outcome.  Trial counsel formulated a strategy, made tactical decisions on the relevant evidence favoring Bass' parole eligibility, mounted a spirited defense on that issue, capably cross-examined the State's witnesses, and made a strong argument in favor of parole under the *Miller* factors.

The problem counsel faced, which proved decisive, was the overwhelming weight of the evidence favoring a life sentence without parole – Bass' own words and actions.  Bass had an extensive juvenile criminal history:  20 guilty adjudications:  11 violent offenses – 3 involving use or brandishing of a knife – and 2 involving brandishing a handgun.  All 20 offenses occurred between the ages of 11 and 17.  Further, Bass' crimes became increasingly violent as he got older.  In addition, based upon a grudge originating in *middle school*, Bass carried out a years-long campaign of harassment against Jackson and, eventually, against his mother and other family members, as well.  Doc. 12-8 at 72–78.  Indeed, the harassment included multiple threats to kill Jackson.  *Id.*  Bass even enlisted the help of his friends to harass and terrorize Jackson and his family.  Doc. 12-8 at 74 (SCR, Vol. 8 at 819).  Finally, Bass attempted to run Jackson over with a car not long before the murder.  *Bass v. State*, 273 So. 3d 768, 772–73 (Miss. Ct. App. 2018).  Finally, Bass threatened to kill Jackson minutes before murdering him – and even stated as he fled the scene, "I hope I killed that bitch."  Doc. 12-5 at 109 (SCR, Vol. 5 at 407).

Indeed, it is difficult to imagine a clearer case of premeditation:  a longstanding grudge, continuing harassment, multiple death threats, and an attempt to drive a car over the victim – all leading up to the murder.  Counsel performed admirably while embarking on a Herculean task –

overcoming Bass' own devastating actions and words.   After studying that record, the trial

court, understandably, came to the conclusion that "there's not a lot in [Bass'] record that

provides the [c]ourt any real substantial hope of rehabilitation," and, "[c]ertainly[,] the events …

leading up to this murder are not such that lead the [c]ourt to conclude that the actual murder was

… an impulsive action on part of the defendant."   Doc. 12-8 at 112 (SCR, Vol. 8 at 857).

       "Counsel was entitled to formulate a strategy that was reasonable at the time and to

balance limited resources in accord with effective trial tactics and strategies."   *Richter*, 562 U.S.

at 109 (citations omitted).   Further, "[t]here is a 'strong presumption' that counsel's attention to

certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'"   *Id.* at

109.   "[T]hat the defense strategy did not work out as well as counsel had hoped" is not proof

"that counsel was incompetent."   *Id.* at 109.   Counsel's strategy was sound, though ultimately

unsuccessful.

### Conclusion as to Grounds One(a) and One(b)

       Bass has not shown that trial counsel was deficient or that he suffered prejudice as a

result of counsel's actions.   In addition, Bass' arguments fail on the merits and do not support

federal *habeas corpus* relief.   Neither have Bass' challenges to trial counsel's investigation and

presentation of mitigating evidence persuaded the court "that law and justice require relief."   28

U.S.C. § 2243; *see also Ramirez*, 142 S. Ct. at 1731 (citing *Davenport*, 142 S. Ct. at 1524);

*Crawford*, Op. *13.   Certainly, counsel's "skill and knowledge … render[ed] the [proceedings] a

reliable adversarial testing process."   *Strickland*, 466 U.S. at 688 (citing *Powell v. Alabama*, 287

U.S. at 68-69.   The petitioner's claims for *habeas corpus* relief in Ground One(a) and One(b)

that counsel was ineffective will therefore be denied.

### Ground Two:   The Trial Court's Denial
### of Funds for a Mitigation Expert

In Ground Two of his Amended Petition, Bass challenges the trial court's denial of his motion for funds to hire a mitigation expert.   Doc. 35 at 12–13.   He argues that the trial court's denial of "funds to retain expert assistance in the field of mitigation investigation" violated his rights to due process and equal protection, offering in support trial counsel's motion for funds, the proposed mitigation investigator's affidavit, and the trial court's order denying the motion. Doc. 35 at 12–13.   Bass re-urges some of trial counsel's arguments in the original motion for funds, then adds "[b]y denying Bass' request for funds to retain a mitigation expert, the state courts unreasonably denied Bass'[] clearly established constitutional rights, and he is therefore entitled to federal *habeas corpus* relief and to have his sentence vacated."   Doc. 35 at 13.

Bass challenged the trial court's denial of funds to hire a mitigation investigator on direct appeal.   The Mississippi Court of Appeals addressed Bass' arguments and affirmed the trial court's denial of Bass' motion for those additional funds.   *Bass*, 273 So. 3d at 778–79.   Bass then brought his challenge in his certiorari petition in the Mississippi Supreme Court, and the court denied review; all participating justices voted for denial.   Exhibit D.

**Standard for Providing Expert Assistance to Indigent Defendants**

First, the "basic tools of an adequate defense" must "be provided to those defendants who cannot afford to pay for them."   *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985).   However, "while the Court has not held that a State must purchase for the indigent defendant all of the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system.'"   *Id*. (citation omitted).

The claim at issue is whether Bass' life sentence should be served with – or without – the possibility of parole, using the five-factor test found in *Miller*.   The five factors are:   (1) the

offender's chronological age and its hallmark features; (2) the offender's family and home environment; (3) the circumstances of the homicide; (4) incompetencies associated with youth—including, inability to deal with police officers or prosecutors, or his incapacity to assist his own attorneys; and (5) the prospect for rehabilitation. However, under *Jones*, during a *Miller* analysis, the sentencing court need not make a separate factual finding of incorrigibility. *Jones v. Mississippi*, 141 S. Ct. 1307, 1313 (2021). Instead, an individual's youth should be treated "as a sentencing factor akin to a mitigating circumstance" similar to the requirement for death-penalty cases—individualized consideration of relevant mitigating circumstances by the sentencer "when deciding whether to impose the death-penalty." *Id*. at 1315-1316.

### Applying *Ake*, *Miller*, and *Jones* to the Present Case

The court will review counsel's arguments and the trial court's ruling on parole eligibility.

### Counsel's Arguments Regarding Experts

Counsel offered largely the same arguments to support his request for both experts – with some additional argument in support of funding for a mitigation expert, and he repeated these arguments in the instant petition. As to both requests, trial counsel argued that "'when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense.'" Doc. 12-2 at 31 (citing *Ake v. Oklahoma*, 470 U.S. at 76; *Douglas v. California*, 372 U.S. 353 (1963)); *see also* Doc. 12-2 at 31 (arguing that "this fundamental principle of due process 'derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake'") (citing *Ake*, 470 U.S. at 76).

- 41 -

Trial counsel also argued that "[t]he Mississippi Supreme Court has held that the decision in *Ake* applies to all experts reasonably necessary for an effective defense." Doc. 12-9 at 31–32 (citations omitted). Finally, trial counsel argued that "the constitutional guarantee of equal protection requires that a defendant be provided with expert assistance reasonably necessary to his defense." Doc. 12-9 at 33 (noting that "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has") (quoting *Griffin v. Illinois*, 351 U.S. 12, 17–19 (1956)).

> Counsel offered additional argument to support his request for a mitigation expert:
>
> A defendant's need for investigative assistance is especially strong for the sentencing phase of *capital* cases because of the extremely broad avenues of potentially relevant mitigation evidence. Under the Eighth Amendment, a defendant in a *capital murder* case must be allowed to proffer any evidence of mitigation submitted as a basis for a sentence less than *death*. *Tennard v. Dretke*, 542 U.S. 274, 285 (2004).

Doc. 12-9 at 15 (emphasis added). Bass continued:

> Every aspect of Mr. Bass' life from conception to the present day must be investigated and this investigation must precede determination of a mitigation case theory. *See Ross v. State*, 954 So. 2d 968, 1005–06 (Miss. 2007); *ABA Guidelines for the Appointment and Performance of Defense Counsel in **Death Penalty Cases*** (2003); *Wiggins v. Smith*, 539 U.S. 510 (2003) (defense counsel ineffective for failing to utilize a forensic social worker to develop and present mitigation evidence at Wiggins' *death penalty* trial); *Lockett v. Anderson*, 230 F.3d 695 (5th Cir. 2000) (two Mississippi *death sentences* reversed where trial counsel failed to follow investigative leads, gather records and present these to competent experts).

Doc. 12-9 at 15–16 (emphasis added). He also argued that "the ABA Guidelines [are] 'guides to determining what is reasonable,'" and "[t]he Guidelines specifically call for 'a mitigation specialist'") (citing *Rompilla v. Beard*, 545 U.S. 374 (2005); *Strickland v. Washington*, 466 U.S. 668 (1984); *Wiggins v. Smith*, 539 U.S. 510 (2003))).

In the present case, both experts, if hired, were to provide evidence and expertise to support the same basic objective at the hearing:   assisting the court by shedding light on the five *Miller* factors in deciding whether Bass' life sentence should allow the possibility for parole.   Bass requested funding for Dr. Lott (the psychologist) to offer expert opinion on the *Miller* factors and attached his affidavit in support.   Doc. 12-9 at 28.   Dr. Lott stated that "[he wa]s familiar with each of the '*Miller* factors' and [wa]s qualified to evaluate how they apply to … Bass, and to testify about the evaluation." Doc. 12-9 at 28.

Bass also requested funding for Rebecca Barnett as a mitigation expert, attaching her affidavit in support.   Doc. 12-2 at 14-27.   Barnett stated that "as the mitigation specialist, [she] assist[s] the attorney[s] by conducting a thorough social history investigation, including[,]" but not limited to: (1) "identifying factors in the client's background or situation that require expert evaluations"; (2) "assisting in locating appropriate experts"; (3) "providing background materials and information to experts to enable them to perform competent and reliable evaluations"; (4) "obtaining records [on] both the client and his family"; (5) "consulting with the attorney [on] the development of the case and case strategy"; (6) "identifying potential penalty phase witnesses"; and (7) "working with the client and his family while the case is pending."   Doc. 12-2 at 22. Barnett explained that "[she] also interview[s] the client to obtain detailed social history information, and to ascertain the names or identities of collateral sources of information."   Doc. 12-2 at 22.   Barnett also stated that "[she] generally prepare[s] a comprehensive social history report containing the information obtained in the investigation" that may be "used by the attorney in developing case strategy and determining who should be witnesses"; and that the report "may be provided to experts performing assessments so that they have adequate

- 43 -

background information to conduct a competent evaluation" and may also be provided to the jury

or judge. Doc. 12-2 at 25.

### The Trial Court's Ruling Regarding Funding for Experts

The trial court granted Bass' request for funding to employ Dr. Lott as a psychologist,

"specifically to examine [Bass] and *provide evidence and insight* to the [c]ourt in the sentencing

of [Bass], pursuant to *Miller v. Alabama*." Doc. 12-2 at 53 (emphasis added). The trial court,

however, denied additional funding for the mitigation investigator. Doc. 12-2 at 50–52. In

doing so, the trial court listed the *Miller* factors, then noted:

> The defense has not cited nor can this court locate a case directly on point with
> the issue presented, that being whether a juvenile defendant is entitled to a court
> appointed mitigation expert following a conviction for first degree murder?
> Almost all of the cases cited by defense counsel involve either (1) a defendant
> seeking an expert for use during the *guilt* phase of trial, or (2) a mitigation expert
> for use during the penalty phase of a *capital murder* (death) sentencing
> proceeding. In such situations *a jury* is being asked to make difficult decisions
> involving issues that perhaps the jury is unfamiliar [with].

Doc. 12-2 at 51–52 (emphasis added).

The trial court thus concluded that a mitigation expert was "unnecessary" for Bass'

*Miller* hearing because "[n]o jury w[ould] be involved in determining the [sentencing] question"

for Bass. Doc. 12-2 at 51–52. The trial court stated that it was "well familiar with the

[mitigation] factors to be analyzed" in "determin[ing] whether [Bass] w[ould] be sentenced to

life in prison *with* or *without* the possibility for parole." Doc. 12-2 at 51–52 (citations omitted).

The trial court also expressed concern that a mitigation expert might merely duplicate the normal

investigative efforts and other tasks that defense counsel undertakes in every case:

> Defense counsel argues that a "social history investigation" is required and that
> lawyers are trained in the law, not in conducting social histories.
> Notwithstanding, lawyers conduct investigations in every single case they handle.
> They determine facts and present those facts to a jury. This court is not
> persuaded that attorneys are so confined in their intellect, experience[,] and

- 44 -

> training that they are incapable of researching and reviewing the personal history
> of a defendant, determining what is pertinent and material to the issue to be
> determined and presenting such evidence to the court. As such, this court does
> not believe that an expert in the field of mitigation investigation is necessary.

Doc. 12-2 at 52 (SCR, Vol. 2 at 48).

In reaching this decision, the trial court met the standard of fundamental fairness by providing funds for Bass to hire a psychologist, Dr. Lott, who stated his belief in his report that Bass could be rehabilitated. Dr. Lott's conclusion, itself, amounted to mitigating evidence. Funding a psychologist to assist with the *Miller* analysis certainly qualifies under *Ake* as one of the "basic tools of an adequate defense." *Ake*, 470 U.S. at 77. Dr. Lott made extensive findings as to each of the *Miller* factors, ultimately concluding that, in his opinion, Bass was not incorrigible and could be rehabilitated. Doc. 12-9 at 36 (SCR, Exhibits).

### The Trial Court's *Miller* Ruling

Finally, using the information gleaned from Dr. Lott's report, the testimony from the *Miller* hearing, and the court record, the trial court made a detailed analysis and, indeed, treated Bass' youth "as a sentencing factor akin to a mitigating circumstance" as in death penalty cases, as described in *Jones, supra*, at 1315-1316. Under *Jones* the trial court was not *required* to make a finding of incorrigibility, but effectively did so in stating "there's not a lot in his record that provides the [c]ourt any real substantial hope of rehabilitation." Doc. 12-8 at 112 (SCR, Vol. 8 at 857). It does not appear that additional information from a mitigation expert would have altered the trial court's conclusion.

As discussed in detail above, the evidence of premeditated murder was overwhelming, and Bass had an extensive criminal history with a pattern of escalating violence. The trial court followed federal law – the five factors from the Supreme Court's ruling in *Miller* – in reaching its ultimate conclusion to impose a sentence of life without the possibility of parole. Further,

the state appellate courts' decision to uphold the trial court's ruling was neither contrary to, nor

an unreasonable application of clearly established federal law; nor was the court's interpretation

of facts unreasonable in light of the evidence presented.   The petitioner's claim that the trial

court erred in denying his request for a mitigation expert is without substantive merit.

### No Evidentiary Hearing Needed

Bass has also requested an evidentiary hearing to resolve the issues in his petition.

Federal courts review a petition for a writ of *habeas corpus* solely to determine whether a

petitioner's constitutional rights have been preserved.   *Herrera v. Collins,* 506 U.S. 390, 400–01

(1993); *Ellis v. Collins,* 956 F.2d 76, 78 (5th Cir. 1992).   The rule regarding whether to hold a

*habeas corpus* evidentiary hearing may be found in 28 U.S.C. § 2254(e)(2), which provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

Federal courts presiding over *habeas corpus* proceedings are not "an alternative forum

for trying facts and issues which a prisoner made insufficient effort to pursue in state

proceedings."   *Cullen v. Pinholster*, 563 U.S. 170, 186 (2011)(citations omitted).   When a

federal court is precluded from reviewing the merits of a petitioner's claim under 28 U.S.C. §

- 46 -

2254(d) because the state court has already decided that issue on the merits, a district court is not required to hold an evidentiary hearing during *habeas corpus* review. *Id.* at 183 (citation omitted). Section 2254(e)(2) curbs federal *habeas corpus* evidentiary hearings – leaving them, except in limited circumstances, in the hands of state courts. *Fuller v. Johnson,* 114 F.3d 491, 496 (5th Cir. 1997); *Hernandez v. Johnson,* 108 F.3d 554, 558 (5th Cir. 1997).

In this case, Bass has not brought a claim that relies on a new rule of constitutional law, expressly made retroactive to cases on collateral review (under 28 U.S.C. § 2254(e)(2)(A)(i)); nor has he brought a claim for which the factual predicate could not have been previously discovered with due diligence (under 28 U.S.C. § 2254(e)(2)(A)(i)). *See* Doc. 35. In addition, he has not shown, " 'by clear and convincing evidence,' that 'no reasonable factfinder' would have convicted him of [first-degree murder]." *Ramirez,* 142 S. Ct. at 1734 (quoting 28 U.S.C. § 2254(e)(2)(B)). Indeed, he has not challenged his guilt; instead, he has challenged whether he should be parole-eligible on his life sentence. Doc. 35. The record currently before the court is sufficient for the court to reach a just decision in this matter. For these reasons, the petitioner's request for an evidentiary hearing will be denied.

**Conclusion**

For the reasons set forth above, the instant petition for a writ of *habeas corpus* will be denied. The petitioner's request for an evidentiary hearing will also be denied. A final judgment consistent with this memorandum opinion will issue today.

**SO ORDERED**, this, the 8th day of August, 2023.

/s/ Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI